UNDER SEAL

AO 91 (Rev. 1/98)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND A. LAM, -1<br>  aka "Nam A. Lam,"<br>SIMON LAM, -2<br>KEN HO, -3<br>  aka "Ken Lam,"<br>  aka "Ken A. Ho,"<br>  aka "Ken A. C. Ho,"<br>ANDY TRAN, -4<br>  aka "Liong Kim Tank,"<br>  aka "Trung Minh Truong,"<br>  aka "Johnny Truong,"<br>SAN S. VOONG, -5<br>  aka "Chen Sheng Wang,"<br>PHIEU TRAN, -6<br>AUGUSTINE BAZAN CAMACHO, -7<br>  aka "Augustine Bazan,"<br>THANH VAN PHU, -8<br>LUC KAI PHUONG, -9<br>  aka "Wong Fong,"<br>  aka "Al Fong,"<br>  aka "Wa Na,"<br>STEVEN HUYTU LAM, and<br>LI YA SI, -11 | CRIMINAL COMPLAINT<br><br>DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>ED13·0143M |

FILED
CLERK, U.S. DISTRICT COURT
MAR 18 2013
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNDER SEAL   ORIGINAL

CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>RAYMOND A. LAM,<br>  aka "Nam A. Lam,"<br>SIMON LAM,<br>KEN HO,<br>  aka "Ken Lam,"<br>  aka "Ken A. Ho,"<br>  aka "Ken A. C. Ho,"<br>ANDY TRAN,<br>  aka "Long Kim Tank,"<br>  aka "Tung Minh Truong,"<br>  aka "Johny Truong,"<br>SAN S. VOONG,<br>  aka "Chen Sheng Wang,"<br>PHIEU TRAN,<br>AUGUSTINE BAZAN CAMACHO,<br>  aka "Augustine Bazan,"<br>THANH VAN PHU,<br>LUC KAI PHOUNG,<br>  aka "Wong Fong,"<br>  aka "Al Fong,"<br>  aka "Na Na,"<br>STEVEN HUYTU LAM, and<br>LI YA SI | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>**ED 13 - 0143M**<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAR 18 2013<br>CENTRAL DISTRICT OF CALIFORNIA<br>EASTERN DIVISION   BY DEPUTY |

Complaint for violations of Title 21, United States Code, Section 846 and 841(a)(1).

| NAME OF MAGISTRATE JUDGE<br>HONORABLE OSWALD PARADA | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>RIVERSIDE, CA |
|---|---|---|

| DATE OF OFFENSE<br>March 20, 2013 | PLACE OF OFFENSE<br>Riverside County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on a date unknown, and continuing to on or about March 20, 2013, in Riverside County, San Bernardino County and Los Angeles County, within the Central District of California, and elsewhere, defendants RAYMOND A. LAM, aka "Nam A. Lam"; SIMON LAM; KEN HO, aka "Ken Lam," aka "Ken A. Ho," aka "Ken A. C. Ho"; ANDY TRAN, aka "Long Kim Tank," aka "Tung Minh Truong," aka "Johny Truong"; SAN S. VOONG, aka "Chen Sheng Wang"; PHIEU TRAN; AUGUSTINE BAZAN CAMACHO, aka "Augustine Bazan"; THANH VAN PHU; LUC KAI PHOUNG, aka "Wong Fong," aka "Al Fong," aka "Na Na"; STEVEN HUYTU LAM; and LI YA SI; and others known and unknown, conspired and agreed with each other knowingly and intentionally to manufacture, distribute, dispense, and possess with intent to distribute a controlled substance, namely at least 1,000 marijuana plants, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Daniel Rosales DEA |
|---|---|
| | OFFICIAL TITLE<br>DEPARTMENT OF DRUG ENFORCEMENT AGENCY |

Sworn to before me and subscribed in my presence,

| | DATE March 18, 2013 |
|---|---|

SIGNATURE OF HON. OSWALD PARADA

Abigail Evans:ii   REC:Detention

I, Daniel Rosales, being duly sworn, declare and state as follows:

## INTRODUCTION

1.    I am an investigative and law enforcement officer of the United States within the meaning of Title 21, United States Code, Section 878, who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Titles 18 and 21, United States Code.

2.    I am a Special Agent (SA) of the Drug Enforcement Administration (DEA), an agency of the Department of Justice.  I have been so employed since November 5, 2005.  Before employment with the DEA, I served four years as an officer in the United States Marine Corps.  I am currently assigned to the Riverside District Office ("RDO"), Riverside, California, in an enforcement group investigating narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  I have received 16 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.  I have been involved in numerous investigations dealing with the possession, manufacturing, distribution, and importation of controlled substances.

3. In narcotics and narcotics money laundering investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, the analysis of

1

telephone records, and the use of various types of informants and cooperating sources. I have participated and assisted in undercover operations and I have planned and executed various arrest and search warrants. I have interviewed various narcotics traffickers and debriefed many informants. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including, but not limited to, the use of cellular telephone technology, counter-surveillance techniques, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations.

4.   I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the oral and written reports about this investigation which I have received from federal agents and local law enforcement agencies.

### PURPOSE OF AFFIDAVIT

5.   This affidavit is made in support of an application for

2

complaints against, and warrants for the arrests of, the following persons (collectively, the "TARGET SUBJECTS"): RAYMOND A. LAM, also known as ("aka") "Nam A. Lam" ("RAYMOND LAM"); SIMON LAM; KEN HO, aka "Ken Lam," aka "Ken A. Ho," aka "Ken A. C. Ho" ("HO"); ANDY TRAN, aka "Long Kim Tank," aka "Tung Minh Truong," aka "Johny Truong" ("ANDY TRAN"); SAN S. VOONG, aka "Chen Sheng Wang" ("VOONG"); LUC KAI PHOUNG, aka "Wong Fong," aka "Al Fong," aka "Na Na" ("PHUONG"); PHIEU TRAN ("PHIEU TRAN"); THANH VAN PHU, ("PHU"); STEVEN HUYTU LAM ("STEVEN LAM"); LI YA SI ("SI") and AUGUSTINE BAZAN CAMACHO, aka "Augustine Bazan," ("CAMACHO").

6.      This affidavit is also made in support of an application for search warrants for the following premises (collectively the "SUBJECT PREMISES"), described in detail herein and in Attachments "A" through "Z" appended hereto, for evidence of the commission of the TARGET OFFENSES; contraband, fruits of the TARGET OFFENSES; property designed for use, or used in committing the TARGET OFFENSES; all as described in Attachments "A-1" through "A-26" appended hereto:

    a.      6544 Peridot Court, Eastvale, California, 92880 ("SUBJECT PREMISES ONE").

    b.      890 Via Blairo, Corona, California, 92879 ("SUBJECT PREMISES TWO").

    c.      2420 El Monte Avenue, Arcadia, California, 91007 ("SUBJECT PREMISES THREE").

    d.      6189 Cedar Creek Road, Eastvale, California, 92880

("SUBJECT PREMISES FOUR").

       e.   6548 Emmerdale Street, Eastvale, California, 92880 ("SUBJECT PREMISES FIVE").

       f.   6754 Bluefield Court, Eastvale, California, 92880 ("SUBJECT PREMISES SIX").

       g.   13796 Havenside Court, Corona, California, 92880 ("SUBJECT PREMISES SEVEN").

       h.   13892 Star Ruby Avenue, Eastvale, California, 92880 ("SUBJECT PREMISES EIGHT").

       i.   14990 Catania Way, Fontana, California, 92336 ("SUBJECT PREMISES NINE").

       j.   18650 Lakepointe Drive, Riverside, California, 92503 ("SUBJECT PREMISES TEN").

       k.   12949 Colonial Drive, Rancho Cucamonga, California, 91739 ("SUBJECT PREMISES ELEVEN").

       l.   6555 Hollis Street, Corona, California, 92880 ("SUBJECT PREMISES TWELVE").

       m.   7137 Midnight Rose Circle, Eastvale, California, 92880 ("SUBJECT PREMISES THIRTEEN").

       n.   7892 Sorrel Lane, Corona, California, 92880 ("SUBJECT PREMISES FOURTEEN").

       o.   14557 Chapman Avenue, Chino, California, 91710 ("SUBJECT PREMISES FIFTEEN").

       p.   1558 Autumn Hill Road, Diamond Bar, California, 91765

4

("SUBJECT PREMISES SIXTEEN").

q.   2416 Havenpark Avenue, El Monte, California, 91733 ("SUBJECT PREMISES SEVENTEEN").

r.   1718 Grace Avenue, Arcadia, California, 91006 ("SUBJECT PREMISES EIGHTEEN").

s.   9760 Callita Street, Arcadia, California, 91007 ("SUBJECT PREMISES NINETEEN").

t.   145 W Longden Avenue, Arcadia, California, 91007 ("SUBJECT PREMISES TWENTY").

u.   1100 S. Hope Street #814, Los Angeles, California, 90015 ("SUBJECT PREMISES TWENTY-ONE").

v.   580 N. Atlantic Boulevard #236, Monterey Park, California, 91803 ("SUBJECT PREMISES TWENTY-TWO").

w.   1804 Chochise Circle, Walnut, California, 91789 ("SUBJECT PREMISES TWENTY-THREE").

x.   11712 Hallwood Drive #1, El Monte, California, 91732 ("SUBJECT PREMISES TWENTY-FOUR").

y.   1917 South 7th Avenue, Arcadia, California, 91006. ("SUBJECT PREMISES TWENTY-FIVE")

z.   5527 Alessandro Avenue, Temple City, California, 91780. ("SUBJECT PREMISES TWENTY-SIX")

7.   This affidavit is based on personal knowledge I gained from my participation in this investigation as well as information from the following sources:

5

a. Oral and written reports about this and other investigations, which I have received from other federal agents and other law enforcement agencies;

b. Physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly;

c. Debriefings of a confidential source;

d. My review of law enforcement records and databases and other official records, including telephone and bank records;

e. My review of telephone toll record information;

f. One of the law enforcement officers who worked with me on this investigation and provided me with written and oral reports is Investigator Mark Reynolds from the Riverside County Sheriff's Department.

8. As described below, the TARGET SUBJECTS have committed and are committing the following offenses: Conspiracy to manufacture, to distribute, and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (the "TARGET OFFENSES").

9. As indicated above, the facts set forth in this affidavit are based upon my personal observations, my training and experience, and my discussions with the other law enforcement personnel described herein. This affidavit is intended to show that there is sufficient probable cause for the requested warrants. This affidavit is not

6

intended to be a complete statement of all known information of evidentiary value, and it does not purport to set forth all of my knowledge of or investigation into this matter.

PREMISES TO BE SEARCHED

10.     The premises to be searched, collectively referenced as the "SUBJECT PREMISES," are described in Attachments "A-1" through "A-26," and are as follows:

a.     SUBJECT PREMISES ONE is located at 6544 Peridot Court, Eastvale, California, 92880.  SUBJECT PREMISES ONE is more fully described as a double-story, single-family residence.  The exterior of the structure has tan colored stucco, white wood trim, and dark colored shingle roof.  The residence has a two car attached garage just north of the front door.  The residence has a front door that faces Peridot court.  The front door to SUBJECT PREMISES ONE is on the center of the residence. The numbers 6544 are affixed in black with a white background to the residence on the northern top corner of the garage.  The areas to be searched include the residence on SUBJECT PREMISES ONE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES ONE, including the car port, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles located upon the property; all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES ONE; and all areas within the boundaries of the property, including beneath

7

the surface of the earth.

b.   SUBJECT PREMISES TWO is located at 890 Via Blairo, Corona, California, 92879.   SUBJECT PREMISES TWO is more fully described as a two-story single-family residence.   The exterior of the structure has tan colored stucco, white wood trim, and dark colored roof.   The residence has a three car attached garage.   SUBJECT PREMISES TWO sits on the south side of Via Blairo.   The front door to SUBJECT PREMISES TWO is on the center of the residence and faces north towards Via Blairo.   The numbers 890 are affixed in black with a white background, to the center of the residence.   The numbers 890 are also painted on the curb just in front of the residence.   The areas to be searched include the residence on SUBJECT PREMISES TWO and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWO, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWO and all areas within the boundaries of the property, including beneath the surface of the earth.

c.   SUBJECT PREMISES THREE is located at 2420 El Monte Avenue, Arcadia, California, 91006.   SUBJECT PREMISES THREE is more fully described as a two-story single-family residence.   The exterior of the structure has brown colored stucco, white wood trim, and a brown tile/shingle roof.   The residence is located on the east side of El

8

Monte Avenue. The front door to SUBJECT PREMISES THREE faces west. The numbers 2420 appear on the white fascia trim to the right of the front door and can be seen from the street. The numbers 2420 are also painted on the curb just in front of the residence and clearly visible from El Monte Avenue. The areas to be searched include the residence on SUBJECT PREMISES THREE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES THREE, including the car port, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles located upon the property; all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES THREE; and all areas within the boundaries of the property, including beneath the surface of the earth.

      d.    SUBJECT PREMISES FOUR is located at 6189 Cedar Creek Road, Eastvale, California, 92880. SUBJECT PREMISES FOUR is more fully described as a double-story, single-family residence. The exterior of the structure has light tan colored stucco, green wood trim, and tan colored roof. The residence has a three car attached garage just north of the front door. The residence has a front door that faces Cedar Creek. The front door to SUBJECT PREMISES FOUR is south of the garage and faces Cedar Creek. The numbers 6189 are affixed in black with a white background to the residence on the southern top corner of the garage. The areas to be searched include the residence on SUBJECT PREMISES FOUR and all rooms, attics, basements, porches,

9

locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES FOUR, including the car port, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles located upon the property; all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES FOUR; and all areas within the boundaries of the property, including beneath the surface of the earth.

e.    SUBJECT PREMISES FIVE is located at 6548 Emmerdale Street, Eastvale, California, 92880.  SUBJECT PREMISES FIVE is more fully described as is more fully described as a double-story, single-family residence.  The exterior of the structure has light colored stucco, light brown wood trim, and a dark colored roof.  The residence has a three car attached garage just south of the front door.  The residence has a front door that faces west towards Emmerdale Street.    The numbers 6548 are affixed in black with a white background to the residence on the southern southwest top corner of the garage. The areas to be searched include the residence on SUBJECT PREMISES FIVE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES FIVE, including the car port, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles located upon the property; all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES FIVE; and all areas within the boundaries of the property, including beneath the

10

surface of the earth.

f.   SUBJECT PREMISES SIX is located at 6754 Bluefield Court, Eastvale, California, 92880.  SUBJECT PREMISES SIX is more fully described as a double-story, single-family residence.  The residence sits on the east side of Bluefield Court.  The exterior of the structure has tan colored stucco, dark wood trim, and dark colored roof.  The residence has two separate attached garages.  One garage is a two car garage with a dark brown garage door facing north.  The other garage is a single car garage with the garage door facing west towards Bluefield Court.  The residence has a dark colored front door that faces Bluefield Court.  The numbers 6754 are affixed in black with a white background to the residence on the top corner of the single car garage near the center of the residence.  The areas to be searched include the residence on SUBJECT PREMISES SIX and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES SIX, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES SIX and all areas within the boundaries of the property, including beneath the surface of the earth.

g.   SUBJECT PREMISES SEVEN is located at 13796 Havenside Court, Corona, California, 92880.  This residence is also commonly listed within the newly incorporated city of Eastvale.  SUBJECT

11

PREMISES SEVEN is more fully described as a two-story single-family residence. The exterior of the structure has light colored stucco and similar colored trim, and a red tile roof. The residence has a three car attached garage. SUBJECT PREMISES SEVEN sits at the end of the cul-de-sac on the north side of Havenside Court. The front door to SUBJECT PREMISES SEVEN is near the center of the residence and faces south towards Havenside Court. The numbers 13796 are in black affixed to a white background, near the center of the residence visible from Havenside Court. The numbers 13796 are also painted on the curb in front of the residence and clearly visible from Havenside Court. The areas to be searched include the residence on SUBJECT PREMISES SEVEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES SEVEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES SEVEN and all areas within the boundaries of the property, including beneath the surface of the earth.

h. SUBJECT PREMISES EIGHT is located at 13892 Star Ruby Avenue, Eastvale, California, 92880. SUBJECT PREMISES EIGHT is more fully described as a two-story single-family residence. The exterior of the structure has light colored stucco. The residence has a two car attached garage. SUBJECT PREMISES EIGHT sits at the north east

12

corner of the intersection of Star Ruby Avenue and Corona Valley Avenue. The front door to SUBJECT PREMISES EIGHT is near the center of the residence and faces south towards Star Ruby Avenue. The numbers 13892 are in black affixed to a white background, near the center of the residence and visible from Star Ruby Avenue. The areas to be searched include the residence on SUBJECT PREMISES EIGHT and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES EIGHT, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES EIGHT and all areas within the boundaries of the property, including beneath the surface of the earth.

i. SUBJECT PREMISES NINE is located at 14990 Catania Way, Fontana, California, 92336. SUBJECT PREMISES NINE is more fully described as a two-story single-family residence. The exterior of the structure has light colored stucco, with similar colored trim, with an orange colored roof. The residence has a three car attached garage. SUBJECT PREMISES NINE sits at the end of the cul-de-sac on the north side of Catania Way. The front door to SUBJECT PREMISES NINE is a double door near the center of the residence and faces south towards Catania Way. The numbers 14990 are in black affixed to a yellow background, on top of the garage on the east side of the

13

residence visible from Catania Way.   The areas to be searched include the residence on SUBJECT PREMISES NINE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES NINE, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES NINE and all areas within the boundaries of the property, including beneath the surface of the earth  residence.

j.   SUBJECT PREMISES TEN is located at 18650 Lakepointe Drive, Riverside, California, 92503.   SUBJECT PREMISES TEN is more fully described as a two-story single-family residence.   The exterior of the structure has tan colored stucco, with similar colored trim, and a light brown colored tile roof.   The residence has a two car attached garage.   SUBJECT PREMISES TEN sits on the south side of Lakepointe Drive.   The front door to SUBJECT PREMISES TEN is near the center of the residence and faces north towards Lakepointe Drive. The numbers 18650 are in black affixed to a white background, affixed to the residence and visible from Lakepointe Drive.   The areas to be searched include the residence on SUBJECT PREMISES TEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers

14

and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TEN and all areas within the boundaries of the property, including beneath the surface of the earth.

k. SUBJECT PREMISES ELEVEN is located at 12949 Colonial Drive, Rancho Cucamonga, California, 91739. SUBJECT PREMISES ELEVEN is more fully described as a two-story, single-family residence. The exterior of the structure has light brown colored stucco, with brown colored trim, and a brown colored shingle roof. The residence has a three car attached garage. SUBJECT PREMISES ELEVEN sits on the south side of a cul-de-sac. The front door to SUBJECT PREMISES ELEVEN is near the center of the residence and faces north towards Colonial Drive. The numbers 12949 are in black affixed to a white background, near the center of the residence visible from Colonial Drive. The numbers 12949 are also painted on the curb in front of the house and clearly visible from Colonial Drive. The areas to be searched include the residence on SUBJECT PREMISES ELEVEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES ELEVEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES ELEVEN and all areas within the boundaries of the property, including beneath the surface of the earth.

l. SUBJECT PREMISES TWELVE is located at 6555 Hollis Street,

15

Corona, California, 92880. SUBJECT PREMISES TWELVE is more fully described as a two-story single-family residence. The exterior of the structure has light colored stucco, with white colored trim, and a light brown colored roof. The residence has a three car attached garage. SUBJECT PREMISES TWELVE sits on a cul-de-sac on the west side of Hollis Street. The front door to SUBJECT PREMISES TWELVE is near the center of the residence and faces east towards Hollis Street. The numbers 6555 are in black affixed to a white background, attached to a pillar on the south side of the residence visible from Hollis Street. The areas to be searched include the residence on SUBJECT PREMISES TWELVE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWELVE, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWELVE and all areas within the boundaries of the property, including beneath the surface of the earth.

m. SUBJECT PREMISES THIRTEEN is located at 7137 Midnight Rose Circle, Eastvale, California, 92880. SUBJECT PREMISES THIRTEEN is more fully described as a two-story single-family residence. The exterior of the structure has light colored wood, with similar colored trim on most of the front of the residence. SUBJECT PREMISES THIRTEEN has a grey colored tile roof. The residence has a three car attached

16

garage.   There is light colored stucco surrounding the garage area of the residence.   SUBJECT PREMISES THIRTEEN sits on a cul-de-sac on the west side of Midnight Rose Circle.   The front door to SUBJECT PREMISES THIRTEEN is near the center of the residence and faces east towards Midnight Rose Circle.   The numbers 7137 are in black affixed to a white background, near the center of the residence visible from Midnight Rose Circle.   The areas to be searched include the residence on SUBJECT PREMISES THIRTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES THIRTEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES THIRTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

n.   SUBJECT PREMISES FOURTEEN is located at 7892 Sorrel Lane, Corona, California, 92880.   SUBJECT PREMISES FOURTEEN is more fully described as a two-story single-family residence.   The exterior of the structure has mostly tan colored stucco, with some similar colored wood.   SUBJECT PREMISES FOURTEEN also has white colored trim, and a dark colored roof.   The residence has two attached garages: a two-car garage with door facing south, and a one-car garage with door facing west.   SUBJECT PREMISES FOURTEEN sits on the east side of Sorrel Lane. The front door to SUBJECT PREMISES FOURTEEN is near the center of

17

the residence and faces west towards Sorrel Lane.  The numbers 7892 are in black affixed to a yellow background, attached to the side of the two-car garage and visible from Sorrel Lane.  The numbers 7892 are painted on the curb in front of the residence and clearly visible from Sorrel Lane.  The areas to be searched include the residence on SUBJECT PREMISES FOURTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES FOURTEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES FOURTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

o.  SUBJECT PREMISES FIFTEEN is located at 14557 Chapman Avenue, Chino, California, 91710.  SUBJECT PREMISES FIFTEEN is more fully described as a two-story single-family residence.  The exterior of the structure has light colored stucco, with brown colored trim, and a brown colored tile roof.  The residence has a two car attached garage.  SUBJECT PREMISES FIFTEEN sits on the east side of Chapman Avenue.  The front door to SUBJECT PREMISES FIFTEEN is angled near the center of the residence and faces south towards Chapman Avenue. The numbers 14557 are in black affixed to a white background, are on the north corner of the residence visible from Chapman Avenue. The numbers 14557 are also on the rear of the residence above the

18

garage. The areas to be searched include the residence on SUBJECT PREMISES FIFTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES FIFTEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES FIFTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

p. SUBJECT PREMISES SIXTEEN is located at 1558 Autumn Hill Road, Diamond Bar, California, 91765. SUBJECT PREMISES SIXTEEN is more fully described as a two-story single-family residence. The exterior of the structure has light colored stucco, with brown colored trim, and a reddish-colored roof. The residence has a two car attached garage. Autumn Hill Road is a cul-de-sac with SUBJECT PREMISES SIXTEEN siting on the east side of Autumn Hill Road. The front door to SUBJECT PREMISES SIXTEEN is near the center of the residence and faces west towards Autumn Hill Road. The numbers 1558 are in gold affixed to the front fascia board of the residence. The numbers 1558 are also painted on the curb just in front of the residence and clearly visible from Autumn Hill Road. The areas to be searched include the residence on SUBJECT PREMISES SIXTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES SIXTEEN, including

19

the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES SIXTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

q.   SUBJECT PREMISES SEVENTEEN is located at 2416 Havenpark Avenue, El Monte, California, 91733.  SUBJECT PREMISES SEVENTEEN is more fully described a two-story single-family residence.  The exterior of the structure has light colored stucco, with light blue colored trim, and a light tan colored roof.  The residence has a two car attached garage.  SUBJECT PREMISES SEVENTEEN sits in a cul-de-sac on the east side of Havenpark Avenue.  The front door to SUBJECT PREMISES SEVENTEEN is on the north side of the residence and faces west towards Havenpark Avenue.  The numbers 2416 are in black affixed to the trim of the residence and clearly visible from Havenpark Avenue. There is a white mail box in the front of the residence marked with the numbers 2416.  The numbers 2416 are also painted on the curb just in front of the residence and clearly visible from Havenpark Avenue. The areas to be searched include the residence on SUBJECT PREMISES SEVENTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES SEVENTEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type

20

of container located upon, and within the boundaries of, SUBJECT PREMISES SEVENTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

　　　r.   SUBJECT PREMISES EIGHTEEN is located at 1718 Grace Avenue, Arcadia, California, 91006.  SUBJECT PREMISES EIGHTEEN is more fully described as a single-story single-family residence.  The exterior of the structure is light colored, with similar colored trim.  The residence has a two car attached garage.  SUBJECT PREMISES EIGHTEEN sits on the east side of Grace Avenue.  The front door to SUBJECT PREMISES EIGHTEEN is near the center of the residence and faces west towards Grace Avenue.  The numbers 1718 are in black affixed to a light colored background, near the center of the residence and visible from Grace Avenue.  The areas to be searched include the residence on SUBJECT PREMISES EIGHTEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES EIGHTEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES EIGHTEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

　　　s.   SUBJECT PREMISES NINETEEN is located at 9760 Callita Street, Arcadia, California, 91007.  SUBJECT PREMISES NINETEEN is more fully described as a single-story single-family residence.  The

21

exterior of the residence has off-white colored stucco looking material, with an attached two car garage.   SUBJECT PREMISES NINETEEN sits on the south-west corner of the intersection of Callita Street and N Golden W Avenue.   The front of the residence faces north towards Callita Street. The front door to SUBJECT PREMISES NINETEEN also faces north towards Callita Street. The numbers 9760 are painted in black near the center of the residence and clearly visible from Callita Street.   The numbers 9760 are also painted in black with a white background, on the curb just in front of the residence and clearly visible from Callita Street.   The areas to be searched include the residence on SUBJECT PREMISES NINETEEN and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES NINETEEN, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES NINETEEN and all areas within the boundaries of the property, including beneath the surface of the earth.

t.   SUBJECT PREMISES TWENTY is located at 145 W Longden Avenue, Arcadia, California, 91007.   SUBJECT PREMISES TWENTY is more fully described as a single-story single-family residence.   The exterior of the structure has red colored brick, with a light blue colored roof trim, and a tan colored roof.   The residence has a large detached garage towards that is in the back of the property.   SUBJECT

22

PREMISES TWENTY sits on the north side of W Longden Avenue. The front door to SUBJECT PREMISES TWENTY is near the center of the residence and faces south towards W Longden Avenue. The numbers 145 are in black affixed to a light blue background, near the center of the residence visible from W Longden Avenue. The numbers 145 are also painted on the curb just in front of the residence and clearly visible from W Longden Avenue. The areas to be searched include the residence on SUBJECT PREMISES TWENTY and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY and all areas within the boundaries of the property, including beneath the surface of the earth.

u. SUBJECT PREMISES TWENTY-ONE is located at 1100 S. Hope Street #814, Los Angeles, California, 90015. SUBJECT PREMISES TWENTY-ONE is more fully described as an individually addressed unit within a multi-unit condominium structure named Luma South. The multi-unit condominium structure sits on the south-east corner of S. Hope Street and W. 11th Street. The exterior of the structure is identified with the numbers 1100 and the letters LUMA attached to the front of the structure and visible from S. Hope Street. SUBJECT PREMISES TWENTY-ONE is located on the 8th floor of the structure and

23

clearly identified with the number 814 attached to the brown colored door of the unit. The areas to be searched include SUBJECT PREMISES TWENTY-ONE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY-ONE, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises or vehicles on the assigned parking space for SUBJECT PREMISES TWENTY-ONE; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-ONE and all areas within the boundaries of the property, including beneath the surface of the earth.

v.    SUBJECT PREMISES TWENTY-TWO is located at 580 N. Atlantic Boulevard, Apt 236, Monterey Park, California, 91803. SUBJECT PREMISES TWENTY-TWO is more fully described as an individually addressed unit within a multi-unit condominium/apartment structure named Atlantic Times Square. The multi-unit condominium/apartment structure sits on the south-east corner of N. Atlantic Boulevard and W. Hellman Avenue. The exterior of the structure is identified with the numbers 580 and the letters Atlantic Times Square attached to the structure and visible from N. Atlantic Boulevard. SUBJECT PREMISES TWENTY-TWO is located on the 2nd floor of the structure and clearly identified with the number 236 attached to a white colored door. The areas to be searched include SUBJECT PREMISES TWENTY-TWO and all rooms, attics, basements, porches, locked containers, safes,

and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY-TWO, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises or vehicles on the assigned parking space for SUBJECT PREMISES TWENTY-TWO; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-TWO and all areas within the boundaries of the property, including beneath the surface of the earth.

w.   SUBJECT PREMISES TWENTY-THREE is located at 1804 Cochise Circle, Walnut, California, 91789.  SUBJECT PREMISES TWENTY-THREE is more fully described as a two-story single-family residence.  The exterior of the structure has cream colored panel siding, with off-white colored trim, and a dark colored roof.  The residence has a three car attached garage.  SUBJECT PREMISES TWENTY-THREE sits at the northeast corner of Cochise Circle and Mountaineer Road in Walnut. The front door to SUBJECT PREMISES TWENTY-THREE is a double door positioned south of the garage and faces southwest towards Cochise and Mountaineer Road.  The numbers 1804 are in white affixed to a black background, near the center of the residence visible from Cochise Circle.  The numbers 1804 are also painted on the curb just in front of the residence and clearly visible from Cochise Circle.  The areas to be searched include the residence on SUBJECT PREMISES TWENTY-THREE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES

25

TWENTY-THREE, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-THREE and all areas within the boundaries of the property, including beneath the surface of the earth.

x.   SUBJECT PREMISES TWENTY-FOUR is located at 11712 Hallwood Drive, El Monte, California, 91732.  SUBJECT PREMISES TWENTY-FOUR is more fully described as a single story single-family residence.  The exterior of the structure has common wood frame construction with blue wood siding exterior with blue trim.  The front door has a black security screen door and faces north towards Hallwood Drive.  The numbers 11712 on a mailbox in front of the residence and can be seen from Hallwood Drive.  SUBJECT PREMISES TWENTY-FOUR sits at the end of a drive way on the south side from Hallwood Drive. The areas to be searched include the residence on SUBJECT PREMISES TWENTY-FOUR and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY-FOUR, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-FOUR and all areas within the boundaries of the property, including beneath the surface of the earth.

y.   SUBJECT PREMISES TWENTY-FIVE is located at 1917 South 7th Avenue, Arcadia, California, 91006.  SUBJECT PREMISES TWENTY-FIVE is more fully described as a two-story single-family residence.  The exterior of the structure has light blue colored stucco, with a brown colored roof.  The residence has a three car attached garage.  SUBJECT PREMISES TWENTY-FIVE sits on the west side of South 7th Avenue. SUBJECT PREMISES TWENTY-FIVE has a white double door near the center of the residence that faces east towards South 7th Avenue.  The numbers 1917 are in black painted on the curb just in front of the residence and visible from South 7th Avenue.  The areas to be searched include the residence on SUBJECT PREMISES TWENTY-FIVE and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY-FIVE, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-FIVE and all areas within the boundaries of the property, including beneath the surface of the earth.

z.   SUBJECT PREMISES TWENTY-SIX is located at 5527 Alessandro Avenue, Temple City, California, 91780.  SUBJECT PREMISES TWENTY-SIX is more fully described as a single-story single-family residence. The exterior of the structure has tan colored stucco, with a tan colored roof.  The residence has a single open carport and a single

27

car garage that shares the same roof of the residence. SUBJECT PREMISES TWENTY-SIX sits at the end of a driveway east of Alessandro Avenue and behind the residence located at 5525 Alessandro Avenue, Temple City, California 91780. The front door to SUBJECT PREMISES TWENTY-SIX is near the center of the residence and faces east towards Alessandro Avenue. The numbers 5527 are in black painted to the curb in front of the residence. There is a brown metal gate that has a mail box attached to it with the numbers 5527 painted  The areas to be searched include the residence on SUBJECT PREMISES TWENTY-SIX and all rooms, attics, basements, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES TWENTY-SIX, including the garage, any storage room(s), storage shed(s), or storage locker(s) thereupon; all vehicles on the premises; and all trash containers and any other type of container located upon, and within the boundaries of, SUBJECT PREMISES TWENTY-SIX and all areas within the boundaries of the property, including beneath the surface of the earth.

## ITEMS TO BE SEIZED

11.  The items to be seized from SUBJECT PREMISES ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE, TEN, ELEVEN, TWELVE, THIRTEEN, FOURTEEN, FIFTEEN, SIXTEEN, SEVENTEEN, EIGHTEEN, NINETEEN, TWENTY , TWENTY-ONE, TWENTY-TWO, TWENTY-THREE, TWENTY-FOUR, TWENTY-FIVE, and TWENTY-SIX are described in Attachment "B" and are as follows:

a.  Articles of personal property tending to establish and document the cultivation, manufacturing, distribution, or possession with intent to distribute, or a conspiracy to cultivate, manufacture, distribute, or possess with intent to distribute, marijuana, methamphetamine, heroin, cocaine, or other illegal narcotics, in violation of Title 21 U.S.C. Section 841(a)(1) and/or Title 21 U.S.C. Section 846:

(1)  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the SUBJECT PREMISES, to include cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys.

(2)  Items used to facilitate the packaging, processing, dilution, weighing, transportation, concealment, or other aspects of the distribution of illegal drugs, to include scales, sifters, hammers, grinders, razor blades, glass panes, mirrors, kilo- or pound-presses, heat-sealers and heat-sealed bags, Ziploc bags, paper bindles, sealed and unsealed cans and canning equipment, and/or other containers, aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease, and diluents or adulterants commonly used to "cut" narcotics substances or other drugs, such as

29

mannitol, mannite, lactose, Vitamin B12, and Methylsufonymethane (MSM).

(3)   Records accounting for the distribution of illegal drugs and the remittance of drug proceeds, to include books, receipts, notes, ledgers, notebooks, computer spreadsheets, and other forms of "pay/owe sheets."

(4)   Secreted contraband, including narcotics and other drugs and the proceeds of drug sales and/or records of drug transactions, which may be stored in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities.

(5)   United States and foreign currency, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments or items of value, both genuine and counterfeit, including but not limited to bearer obligations of any type; records, documents, or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth, to include documents and records relating to the existence or use of foreign and domestic banks and services attendant thereto, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, the purchase of real estate or vehicles, the establishment of shell corporations and business fronts, for the

30

period 2003 to the present; records, documents, or other evidence relating to the existence of wire transfers, cashiers' checks, and money orders, for the period 2003 to the present; and money counting machines.

(6)   Records relating to the use of the United States Postal Service, FedEx, UPS, or similar parcel or courier services, to include receipts, copies of air bills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, for the period 2003 to the present.

(7)   Records listing names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses relating to the distribution of controlled substances, to include such records stored electronically within the memory of telephones, pagers, and personal digital assistants such as "Palm," "Blackberry," and similar devices.

(8)   Cellular telephones, satellite telephones, pagers and text-messaging devices, voicemail or answering machine systems, telephone calling cards, and personal digital assistants such as "Palm," "Blackberry," and similar devices.

(9)   Records relating to travel by car, bus, train, or airplane, both domestically and to foreign countries, to include calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information and records

31

associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, for the period 2003 to the present.

(10) Firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons which are stolen or otherwise possessed illegally.

(11) Two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment.

(12) Photographs and/or videos depicting the defendants, their criminal associates, their real and personal property, their weapons, and their drugs.

(13) Marijuana, paraphernalia commonly associated with the use of marijuana, including, but not limited to baggies, scales and other weighing devices, and containers of various types commonly associated with the storage, use and sales of marijuana.

(14) Items tending to establish the existence of marijuana cultivation, including, but not limited to, internal/external irrigations systems (including any and all component parts such as drip lines and pumps), electrical generators, electrical transformers and cables, high intensity lamps and light bulbs, growth hormones, plant fertilizer, planting spikes, and marijuana stems and seeds.

(15) Fruits of the manufacturing, distribution, or

32

possession with intent to distribute, or a conspiracy to manufacture, distribute, or possess with intent to distribute, methamphetamine, heroin, cocaine, or other drugs, in violation of Title 21 U.S.C. Section 841(a)(1) and/or Title 21 U.S.C. Section 846.

b.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

## BACKGROUND OF INVESTIGATION

12.  I am currently participating in an investigation into an Asian organized crime ring that is involved in the cultivating and distribution of large amounts of marijuana.  This organization has been establishing marijuana grow houses throughout Los Angeles, Riverside and San Bernardino counties, among other locations in Southern California.  The organization is involved in the purchase or lease of single-family residences which are then converted to indoor farms, for the sole purpose of growing marijuana.

13.  The marijuana grow houses in this investigation are usually rented using nominee identities who enter into rental contracts on behalf of this Drug Trafficking Organization (DTO) cell heads.  The marijuana grow houses exhibit identical set-ups, namely, the use of certain types of hydroponic growing equipment and the fact that electrical power is stolen through sophisticated bypasses of utility meters.

14.  I believe that TARGET SUBJECT RAYMOND LAM is the overall

33

leader of the LAM drug trafficking organization. RAYMOND LAM oversees, directs, supervises, coordinates and facilitates the procurement and the conversion of the SUBJECT PREMISES into full-scale, industrial-type marijuana grows.

15.   TARGET SUBJECTS SIMON LAM, HO, VOONG, and ANDY TRAN are top-level leaders who are directed and supervised by RAYMOND LAM within the organization.  These TARGET SUBJECTS have full access to many or all of the organizations residential marijuana grows. They are also believed to assist in the acquisition of residences for the organization's future marijuana grow houses, and to participate in setting up the grow houses.

16.   TARGET SUBJECTS STEVEN LAM, SI, and PHIEU TRAN are lower-level leadership within the organization.  These TARGET SUBJECTS manage three-to-four residential marijuana grow locations for the organization.   They are involved in the day-to-day operations of their assigned marijuana grow residences, including overseeing the tending of the marijuana crops, transporting marijuana and related materials, and generally facilitating the upper leadership in managing the marijuana grows.

17.   Laborers known as "plant tenders" are utilized by the LAM DTO for the maintenance of the individual marijuana plants being grown in a residence. "Plant Tender" responsibilities may include, but are not limited to planting, watering, trimming, and harvesting of the marijuana plants, and assisting with setting up marijuana grow

34

operations.  TARGET SUBJECT CAMACHO is a veteran "plant tender" who is responsible for maintaining many of the LAM DTO grow residences.

18.  I believe that the LAM organization employs PHOUNG for the construction of electrical systems that facilitate the air conditioning, lighting, and ventilation systems for the grow houses. PHOUNG is also believed to devise the utility meter by-pass that allows for the theft of electrical utilities.  Revenue Protection Investigators ("RPI") from Southern California Edison ("SCE") have informed me that, with the implementation of these illegal utility meter by-pass systems, each grow house identified throughout this investigation is billed at a fraction of the actual value of the massive volume of electricity that utilized to maintain these large marijuana cultivation operations.  SCE has informed me that the excessive use of electricity by the operations, which are located in residential areas, also pose serious safety risks to the communities in which they are located.

## OVERVIEW OF INDOOR HYDROPONIC MARIJUANA GROWING

19.  A discussion of the process by which one grows marijuana successfully indoors begins with basic botany.  Plants, including marijuana, use two basic processes to grow.  These processes are osmosis and photosynthesis.

   a.   OSMOSIS—The plant takes up water and minerals through the root system.

35

b.    PHOTOSYNTHESIS—The plant utilizes light and the atmosphere to transform water and minerals into plant tissue.

20.    The seeds of a plant contain all the genetic material which gives a plant its characteristics, including, in the case of marijuana, the production of tetrahyrocannabinol (THC). THC is the psychoactive ingredient in marijuana. When a female marijuana plant flowers, THC is produced. Since marijuana is an annual plant, the plant must pollinate and produce seeds to reproduce and continue each year. If a plant is found with good genetic characteristics (high THC levels), a grower will wish to continue the strain by cloning. Cloning means taking clippings from a "mother" plant and planting them, with each of those plants growing into a genetic duplicate of the "mother" plant. THC levels will be the same. Selective breeding and cloning must be used to obtain a garden of plants capable of producing extremely high levels of THC. Marijuana plants will go through several stages in a single season, ending with a flowering stage. During flowering, the female plants flowers will cluster together forming buds or colas. These buds will contain a sticky resin, designed to catch male pollen. This resin contains the highest concentration of THC. If no male plants are present in the garden, the female plants will produce even more of this resin, in search of male pollen to be able to continue its life-cycle. This result is extremely desirable for a marijuana grower, as the levels of THC

36

will be extremely high. Once the resin production is at its peak and the THC levels are at their highest, the crop is harvested for distribution. Sinsemilla, ("without seed") is a female plant that has not been pollinated. If the plant gets pollinated, it ceases resin production. Since these plants will have high resin production, they command the highest price for distribution. The hydroponic process is ideal for this since the male plants can be removed and pollination can be prevented.

21. If the plant is a clone of a good "mother" plant, the THC levels will be almost identical. It should be noted that since a small cutting or clone of a "mother" plant is a genetic duplicate of an older plant, the THC levels are the same as that older plant. It is not a new plant and is just as psychoactive as a fully grown plant, despite its small size. From the stock of a couple of good "mother" plants, a grower could clone two or 2,000 plants of the same type.

22. Hydroponic systems are ideal for marijuana. The systems are designed to give the marijuana plant all of the elements necessary for plant growth. Marijuana plants flower outside when the seasons change from summer to fall, and the amount of light the plant receives each day is equal to the amount of dark. By controlling how much light the plant receives indoors with special grow lights and timers, a marijuana grower can trick the plants into a fall cycle and trigger flowering. Using this method, an entire life cycle of a marijuana plant can be shortened to a few months.

37

TYPICAL HYDROPONIC GROWING EQUIPMENT

23. In hydroponic systems, plants are grown by supplying the food a plant needs through water containing nutrients, minerals, and air. In a typical hydroponic system the plants will be in an inert growing medium, such as clay pebbles or rockwool. Grodan is a popular type of rockwool. Numerous plants will sit in these Grodan cubes or small pots under grow lights. In the current investigation, the growers are using specially designed trays to hold the plants. These trays will be off the floor, with vats of water and plant nutrients below. Hoses connect the vats with the trays. Triggered by electronic timers, pumps will flood the grow trays, the growing medium, and the marijuana plant roots with this nutrient solution. Once the trays are filled, the fluid will drain back into the vat below for reuse. Plants use carbon dioxide ($CO2$) to grow and produce oxygen during photosynthesis. Some marijuana growers will use $CO2$ tanks with regulators and tubing throughout a marijuana garden to increase the amount of $CO2$ in the atmosphere, thereby increasing the yield of the crop. Using this technique, every element a growing plant needs is replicated indoors. The sun (light bulbs), soil (grow medium with nutrients, rain (water from the reservoirs), and air (oxygen and $CO2$) can all be controlled indoors to give a marijuana grower the maximum yield.

24. The lights used in marijuana cultivation use a great deal of energy and produce heat. The ideal temperature for marijuana is

38

70 degrees (F). Since the light temperatures exceed that, a marijuana grower will need to vent some of the hot air out of the garden and get cooler, fresh air in. Air conditioners will sometimes be used to assist in keeping the garden at an ideal temperature. Fans will also sometimes be mounted to keep the lights cooler, and to generally circulate air through the garden. Since the lights, pumps, timers, and air conditioners consume excessive amounts of electricity, large scale marijuana growers might steal power. This can be accomplished several ways to avoid detection by law enforcement, utility companies, and to simply avoid paying a high power bill.

## FACTS ESTABLISHING PROBABLE CAUSE FOR THE REQUESTED WARRANTS

25. Based on my personal involvement in this investigation; conversations with other law enforcement investigators; my review of information regarding the TARGET SUBJECTS obtained from the California Department of Motor Vehicles ("DMV"), the National Crime Information Center ("NCIC"), the California Information Index ("CII"), the CDC, and other databases available to law enforcement; my personal observations and perceptions and, where indicated, the observations and perceptions of others as related to me, I have learned the following facts:

### SUBJECT PREMISES ONE

26. I believe that SUBJECT PREMISES ONE is a marijuana grow house connected to RAYMOND LAM. Since the start of this investigation all of the windows and blinds of the residence have remained closed

39

with the exception of one window on the second floor, which has remained open. From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

27. On multiple occasions during this investigation, RAYMOND LAM and CAMACHO have been observed entering and exiting SUBJECT PREMISES ONE. RAYMOND LAM and CAMACHO have been observed arriving at the residence, parking inside the garage and closing the garage door before exiting their vehicles. During the course of the investigation, no other persons or vehicles have been seen in the vicinity of SUBJECT PREMISES ONE.

28. Southern California Edison ("SCE") records identify the subscriber of electrical services for SUBJECT PREMISES ONE to be "Paul Nugyen," with no further information. A DMV check identified a "Paul Nugyen" with a California Driver's License number of #B5299266 currently residing in Pomona, California. No subject matching the description of "Paul Nugyen" has ever been seen at SUBJECT PREMISES ONE.

29. I know from training and experience that drug trafficking organizations involved in large-scale marijuana growing operations will often use false names and dates of birth to acquire multiple rental properties and utility services. This is done to protect the identities of the individuals involved in the operation, in case the

40

location is discovered by law enforcement.

30.  On June 18, 2012, RCSD conducted surveillance at SUBJECT PREMISES ONE.  RCSD investigators heard a loud humming from exhaust fans coming from the residence.  This humming sound is commonly associated with equipment, such as fans, and filters, utilized during indoor marijuana cultivation operations.

31.  On or about February 20, 2013, SCE investigators conducted an "amp check" at SUBJECT PREMISES ONE.  An "Amp Check" is conducted when it is suspected that a customer is stealing electrical services. Your affiant knows by training and experience that electrical by passes are commonly installed inside residences that are involved in the illegal cultivation of marijuana. Person(s) involved in this type of activity commonly install electrical by-passes to steal electricity and not to cause attention to themselves, by either the electric company or law enforcement.

32.  The amperage reading at SUBJECT PRESMISES ONE registered 18 amps.  SCE Investigator Cervantes informed me that, from his experience, a residence of similar size may register average amperage ranging from three to fifteen amps. I know from my training and experience that residential marijuana grows register higher amperage due to the usage of marijuana grow equipment, such as air conditioning units, ventilation systems, and industrial grow lighting.

33.  SCE reported that a reading of 18 amps should equate to a monthly charge of approximately $194, and that the monthly bill

41

for SUBJECT PREMISES ONE was $139. SCE investigators indicated that this discrepancy in amperage use and billing indicates the presence of an illegal electrical by-pass system. SCE investigators also noticed a discrepancy at SUBJECT PREMISES ONE between the amperage reading at the transformer and at the property, which should be identical, and which may indicate tampering of the electrical utility equipment.

SUBJECT PREMISES TWO

34. I believe that SUBJECT PREMISES TWO is a marijuana grow house connected to RAYMOND LAM and SIMON LAM. Since the start of this investigation all of the windows and blinds of the residence have remained closed with the exception of one window on the second floor, which has remained open. From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

35. As further described below, during several surveillances in the course of the investigation, RAYMOND LAM, SIMON LAM and HO have been observed entering and exiting SUBJECT PREMISES TWO.

36. A September 2011 check of SCE records identified the subscriber of electrical services for SUBJECT PREMISES TWO as "Lee Hung," with California Driver's License number of #D4758236. A DMV check of license #D4758236 revealed the license was issued to a Hispanic male residing in Rialto, California.

42

37.   SCE records indicate that in June 2012, the subscriber for electrical service for SUBJECT PREMISES TWO was changed to "Denny Chen," who provided California Driver's License number of #A4881675. A DMV check of license #A4881675 revealed the license was issued to a Hispanic female residing in Bakersfield California.

38.   On February 20, 2013, SCE conducted an amp check at SUBJECT PREMISES TWO. The amperage reading registered 250 amps. SCE investigators reported that a reading of 250 amps should equate to a monthly charge of approximately $2,700, and that property located at SUBJECT PREMISES TWO incurred a monthly bill of only $342.44. SCE investigator Cervantes informed me that from his experience, this discrepancy in amperage use and billing indicates the presence of an illegal electrical by-pass system.

SUBJECT PREMISES THREE

39.   I believe that SUBJECT PREMISES THREE is the recently built residence of RAYMOND LAM. On or about December 27, 2012 at approximately 8:30 a.m., RCSD observed that at RAYMOND LAM's prior residence located at 20111 Roundtree Court, Walnut, California, RAYMOND LAM's vehicle was not parked at the location, and several previously observed surveillance cameras had been removed from the residence. Information was received from SCE Edison that the previous tenants had disconnected power on December 14, 2012. RCSD then established surveillance at 2420 El Monte Avenue, Arcadia, California (SUBJECT PREMISES THREE) and observed that a black Audi

43

4-door, CA license 6WSJ388 parked on the driveway, which was registered to RAYMOND LAM.

40.   On December 28, 2012, SCE conducted a meter inspection at SUBJECT PREMISES THREE, during which they observed RAYMOND LAM's white Chevy Avalanche (CA license 90463C1) and black Audi parked on the driveway at the rear of the residence.

41.   On January 15, 2013, RCSD established surveillance at Dream Garden Hydroponics located at 2701 Merced Ave, El Monte, California, and observed the following vehicles, among others, parked at the location: RAYMOND LAM's Avalanche, a grey 2010 Lexus RX35, CA license 6KZW110 (observed during previous surveillance driven by HO); and a white 2006 Infinity G-35, CA license 5THS708 (observed during previous surveillance driven by PHU).

42.   At approximately 4:08 p.m., RCSD followed RAYMOND LAM from Garden Hydroponics to SUBJECT PREMISES THREE, where he parked his vehicle on the driveway and walked to the back of the residence. RAYMOND LAM exited the residence through the front door, removed a large box from the rear seat of his vehicle and took it into the residence.  RAYMOND LAM was also observed exiting the residence through the front door carrying a bag of trash which he placed into a trash can, and returned to the residence

SUBJECT PREMISES FOUR

43.   I believe that SUBJECT PREMISES FOUR is a marijuana grow house connected to RAYMOND LAM, STEVEN LAM and HO.  Since the start

44

of this investigation all of the windows and blinds of the residence have remained closed with the exception of one window on the second floor, which has remained open.  From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

44.  As further described below, during several surveillances in the course of this investigation, RAYMOND LAM, STEVEN LAM and HO have been observed entering and exiting SUBJECT PREMISES FOUR.  On at least two occasions, RAYMOND LAM and STEVEN LAM were observed arriving at the residence, parking inside the garage and closing the garage door before exiting their vehicle.  During the course of this investigation, no other persons or vehicles unrelated to RAYMOND LAM, STEVEN LAM or HO have been seen in or around SUBJECT PREMISES FOUR.

45.  SCE records identify the subscriber of electrical services for SUBJECT PREMISES FOUR as "Ngoc Vuong" with California Driver's License number of #A4875176.  A DMV check of license #A4875176 revealed the license was issued to Eric James Culver residing in San Diego California.  During the course of this investigation, no person matching the description of Eric James Culver has ever been seen at SUBJECT PREMISES FOUR.

46.  SCE investigators conducted an amp check at SUBJECT PREMISES FOUR on February 26, 2013, and the reading registered 35

45

amps. SCE investigators reported that a reading of 35 amps should equate to a monthly charge of approximately $378, and that the monthly bill for SUBJECT PREMISES FOUR was 231.68. SCE investigator Cervantes informed me that, from his experience, this discrepancy in amperage use and billing indicates the presence of an illegal electrical by-pass system.

47. On or about February 20, 2013, RSO Investigators detected a strong odor of marijuana coming from SUBJECT PREMISES FOUR.

SUBJECT PREMISES FIVE

48. I believe that SUBJECT PREMISES FIVE is a marijuana grow house connected to RAYMOND LAM, SIMON LAM and HO. Since the start of this investigation all of the windows and blinds of the residence have remained closed with the exception of one window on the second floor, which has remained open. From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

49. As further described below, during several surveillances in the course of the investigation, RAYMOND LAM, SIMON LAM and HO have been observed entering and exiting SUBJECT PREMISES FIVE, sometimes only staying at the residence for five to ten minutes.

50. SCE records identify the subscriber of electrical services for SUBJECT PREMISES FIVE to be "Wu, Su" with no further information.

46

A DMV check identified a "Su, Wu" with a California Driver's License number of #B7508584 currently residing in Riverside, California. During the course of this investigation, no one matching the description of Su, Wu has ever been observed at SUBJECT PREMISES FIVE.

51.   SCE investigators reported that during an amp check on February 20, 2013 at SUBJECT PREMISES FIVE, the amperage reading registered 230 amps. SCE investigators reported that a reading of 230 amps should equate to a monthly charge of approximately $2,482, but that the monthly bill for SUBJECT PREMISES FIVE was only $405.61. SCE investigator Cervantes informed me that, from his experience that this discrepancy in amperage uses and billing indicates the presence of an illegal electrical by-pass system.  SCE investigator Cervantes informed me that from his experience, a residence of similar size may register an average amperage ranging from three to fifteen amps. I know, from training and experience, that residential marijuana grows register higher amperage due to the usage of marijuana grow equipment such as air conditioning units, ventilation systems, and industrial grow lighting.

52.   On or about February 20, 2013, RSO Investigators detected a strong odor of marijuana coming from SUBJECT PREMISES FIVE.

SUBJECT PREMISES SIX

53.   SUBJECT PREMISES SIX is believed to be a marijuana grow house connected to RAYMOND LAM, STEVEN LAM, SIMON LAM, and HO.  Since the start of this investigation all of the windows and blinds of the

47

residence have remained closed with the exception of one window on the second floor, which is partially open. From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

54.  As further described below, during several surveillances in the course of the investigation, RAYMOND LAM, STEVEN LAM, SIMON LAM, and HO have been observed entering and exiting SUBJECT PREMISES SIX, at times arriving at the residence, parking inside the garage and closing the garage door before exiting their vehicle. RCSD investigators were able to smell a strong odor of marijuana coming from the residence. During the course of this investigation, no other persons or vehicles have been observed in the area of SUBJECT PREMISES SIX.

55.  Southern California Edison records identify the subscriber of electrical services for SUBJECT PREMISES SIX to be "Mitha Pratiwi" with a social Security number of XXX-XX-4556. A check of Social Security #XXX-XX-4556 revealed the number had been issued to Patrick Reyes residing in Linden, New Jersey.

56.  During surveillance at SUBJECT PREMISES SIX on June 14, 2012, RCSD investigators could hear a loud humming from exhaust fans coming from the residence that is commonly associated with equipment such as fans and filters, utilized during indoor marijuana cultivation

48

operations.

57. During surveillance conducted on February 20, 2013, at SUBJECT PREMISES SIX, an odor commonly associated with marijuana was detected emitting from the garage of the residence. RCSD investigators also reported feeling vibration on the front door indicating possible marijuana grow equipment use. No sounds of an air conditioning unit or ventilation system could be heard.

SCE investigators reported that during an amp check conducted on March 1, 2013 at SUBJECT PREMISES SIX, the amperage reading registered 20 amps. RPI Cervantes knows from experience, that a residence of similar size may register average amperage ranging from three to fifteen amps. I know from training and experience that residential marijuana grows register higher amperage due to the usage of marijuana grow equipment such as air conditioning units, ventilation systems, and industrial grow lighting.

58. SCE reported that a reading of 20 amps should equate to a monthly charge of approximately $216, but that SUBJECT PREMISES SIX had a monthly bill of $153. SCE Investigator Cervantes informed me that, from his experience, this discrepancy in amperage use and billing indicates the presence of an illegal electrical by-pass system.

SUBJECT PREMISES SEVEN

59. SUBJECT PREMISES SEVEN is believed to be a marijuana grow house connected to RAYMOND LAM, SIMON LAM, and HO. Since the start

of this investigation all of the windows and blinds of the residence have remained closed. From my training and experience, I know that keeping windows closed and the blinds down is commonly done in order to conceal the presence of a marijuana grow, and that one small window is often left open to assist the ventilation of the marijuana grow.

60.   As further described below, during several surveillances in the course of the investigation, RAYMOND LAM, SIMON LAM, and HO have been observed entering and exiting SUBJECT PREMISES SEVEN, arriving at the residence, parking inside the garage and closing the garage door before exiting their vehicle. RCSD investigators could smell a strong odor of marijuana coming from the residence.

61.   SCE records identify the subscriber of electrical services for SUBJECT PREMISES SEVEN to be "Quy Wong" with no further information.   RCSD was unable to locate any California Driver's License or Identification card related to this name.

62.   During surveillance on June 27, 2012, RCSD officers smelled the odor of marijuana coming from the residence.

63.   SCE investigators reported that during an amperage check on February 20, 2013 at SUBJECT PREMISES SEVEN, the amperage reading registered 100 amps.

64.   SCE reported that a reading of 100 amps should equate to a monthly charge of approximately $1080, but that the monthly bill for SUJBECT PREMISES SEVEN was $266. SCE investigator Cervantes informed me that, from his experience, this discrepancy in amperage

50